# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
August 9, 2001 Session

## KATY WILSON, ET AL. v. DICKSON COUNTY, TENNESSEE, ET AL.

### Appeal from the Circuit Court for Dickson County
#### No. CV1090     Allen Wallace, Judge

---

### No. M2000-02680-COA-R3-CV - Filed October 25, 2001

---

This is a GTLA action for damages for wrongful death caused by the admitted negligence of a paramedic, (who enjoyed no immunity) employed by the county, which enjoyed immunity. Pecuniary damages of $385,000 for the value of the decedent's life were awarded, together with a separate award of $500,000 for "consortium-type damages."  As against the County and its ambulance service, the total award cannot exceed $130,000.  As against the paramedic the award is limited only by the standard of reasonableness.  The total award is reduced to $500,000.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
### Affirmed in Part and Modified in Part

WILLIAM H. INMAN, SR. J., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, J.J., joined.

William C. Moody, Nashville, Tennessee, for the appellants, Dickson County, Tennessee; Dickson County Ambulance Service; and David Cline.

Walter W. Bussart, Lewisburg, Tennessee, for the appellee, Katy Wilson.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Heather C. Ross, Senior Counsel, for the intervenor, State of Tennessee.

### OPINION

This is an action for damages for the alleged wrongful death of Clayton Wilson who suffered a heart attack at his home in the early morning hours of November 20, 1997 and died in the emergency room of a hospital.  He was 51 years old, and was survived by his widow, Katy Wilson, and two children.

Responding to a 911 call, Donald Tinsley, an EMT, and David Cline, a paramedic, both of whom were employed by the Dickson County Ambulance Service, arrived at the residence. Clayton Wilson was breathing, and oxygen was administered. He was carried by stretcher to the ambulance and transported to a hospital.

The ambulance was equipped with a cardiac defibrillator which admittedly was not used. The failure of the paramedic, David Cline, to use the defibrillator is the basis of this litigation.

The complaint alleged that the defendant David Cline was negligent and deviated from the recognized standard of care in Dickson County in the care and treatment of Clayton Wilson in that he failed to use the defibrillator, failed to intubate Mr. Wilson, failed to call the emergency room and in other particulars.

The factual pattern need not be labored in light of the admission of David Cline that he was negligent in failing to take a monitor/defibrillator into the Wilson residence. His counsel concedes that Cline was negligent, but not proximately so, and does not question the applicability of the doctrine of *respondent superior* with respect to the Ambulance Service and Dickson County.

Because the Governmental Tort Liability Act was implicated, T.C.A. § 29-20-205 *et seq.,* the case was tried without a jury. The trial judge found that the admitted negligence of David Cline, contrary to the insistence of the defendants, was the proximate cause of the death of Mr. Wilson.

Judgment for $385,000, described as representing the pecuniary value of the life of Mr. Wilson, and $500,000 representing damages for the loss of consortium, was awarded the plaintiffs. The defendants appeal, presenting for review the issues discussed *in seriatim.* Our review is *de novo* on the record accompanied with a presumption that the judgment is correct unless the evidence otherwise preponderates. Rule 13(d), T.R.A.P. The presumptive correctness principle does not apply to questions of law.

## Issue One

Does the preponderance of the evidence support the trial judge's finding that the negligence of the defendants proximately caused the death of Clayton Wilson?

The testimony of Donald Tinsley is likely pivotal. He manuscripted an account of the event soon after leaving the hospital, and his testimony tracks the recorded account. We have reproduced his account as an Appendix to this opinion. Suffice to say that the opinion of Dr. Smith to an important extent assumed as true the statements of Mr. Tinsley, while the other experts tended

otherwise.[1]  Dr. Smith believed that Mr. Wilson had a 60-70 percent chance of survival had the defibrillator been used.

To recount somewhat, this is a medical malpractice case governed by the provisions of T.C.A. § 29-26-115 *et seq.*  The plaintiff has the burden of proving that as a proximate result of Cline's negligence the decedent suffered injuries which would not otherwise have occurred.  T.C.A. § 29-26-115(a)(3).  Reduced to simple terms, the plaintiff says her husband suffered a cardiac arrest, which would not have been fatal had the paramedic acted appropriately.  The defendants say that even had Mr. Wilson been defibrillated, he would have died anyway.  The opinion of the Supreme Court in ***Kilpatrick v. Bryant***, 868 S.W.2d 594 (Tenn. 1993) settles the legal issue.  The Court held ". . . the rule requiring causation be proved by a preponderance of the evidence dictates that plaintiffs demonstrate that the negligence *more likely than not caused the injury.*" [Emphasis in original].

Dr. Smith testified orally, as contrasted with Drs. McMurray and Fesmire who testified by video depositions.  With respect to the depositional testimony we are as well situated as the trial judge to judge of their worth and weight, but with respect to the testimony of Dr. Smith the rule is different because the trial judge observed his manner, mien, attitude and credibility.

Suffice to say that the trial judge extolled Dr. Smith and his testimony while finding considerable fault with Drs. McMurray and Fesmire.

Dr. Smith is a board-certified, peripatetic practitioner and professor of emergency medicine licensed in four states including Tennessee.  He testified that he had an appointment as a professor of emergency medicine at the University of Tennessee at Chattanooga, and served as Chairman of the Emergency Department at Erlanger Hospital in Chattanooga.  His qualifications as an expert in emergency medicine were not questioned.

Dr. Smith reviewed the historicity of the apparent heart attack suffered by Mr. Wilson.  When asked to "tell the court what you understand to be the circumstances involved in Mr. Wilson's death on November 20, 1997," he responded, without objection, at great length:

A.      Well at approximately 1:00 a.m., he awakened his wife saying that he didn't feel well.  He was not very specific apparently in what he related, just that he didn't feel good.  He got up, got out of bed and walked around a little bit, said he felt – I think he went to the bathroom, said he felt better.  Came back, got back in bed again denying any specific complaints because his wife sort of queried him being a nurse.  And he laid in bed for a few minutes and then got up again saying he didn't feel well.  Got up, walked around a little bit more.

---

[1] Mr. Tinsley was aware that not everything that could be done for Mr. Wilson was done.  He attributes the dereliction to Cline because of his advanced training.  His awareness was so acute that he wrote the appended document shortly after leaving the hospital.  Tinsley admitted that he knew the defibrillator should have been taken into the house.  He blames Cline for this failure.  It seems to us that Tinsley had a like duty with respect to the defibrillator, which tends to detract from the somewhat lavish praise heaped upon him for his recitation.

Laid back down still saying he didn't feel well, told her that he loved her. And apparently she turned to call the ambulance and became aware of something going on in the bed behind her. She turned back over and he was having what she described as a grand mal seizure.

At that point he became unresponsive, unconscious and remained that way from that point on.

She then called EMS to summons an ambulance and then started to perform CPR on him while he was in bed because she couldn't feel a pulse. She's maintained that he continued to breathe, but she could not feel a pulse.

She then summoned her daughter down from upstairs, had her call their – or I guess it was his son who lived approximately a third of a mile away, something like that, to come help her do CPR because he was such a big man she couldn't get him out of bed. And she knew to maximize the efficiency of CPR she needed him on a hard surface. She continued to do CPR compressions apparently while he was in the bed.

The son arrived, they put him on the floor and then started doing two person CPR. Although, they said that he continued to breathe spontaneously during this period of time.

Then a second call was placed to EMS, I think by the daughter, just basically wondering where the ambulance was. It seemed like it had been an extraordinarily long period of time for the ambulance, most everybody feels, and at that time informed EMS that now CPR was in progress as opposed to – apparently it had been initially logged in as respiratory distress and now they were told it was a full code, CPR in progress.

Approximately two to three minutes later EMS arrived and there's some debate exactly when the CPR was stopped by Ms. Wilson and her son, but somewhere around the time the EMS unit arrived they stopped and the paramedic and EMT came in, and again there's seemingly a little bit of debate here of exactly what happened. One version is the paramedic went on in with Mr. Wilson and the EMT stopped to talk briefly with, I'm assuming it was the son, and then came into the room, was told to go back out to the rig and get the stretcher and a backboard, a full length backboard.

And during that period of time the paramedic was primarily focusing on the airway apparently, bagging the patient with what we call a bag valve mask apparatus hooked to oxygen. And came back in, they continued CPR briefly, then put him on the backboard, put him on the stretcher and took him back

-4-

out to the back of the rig, the ambulance truck, whatever you want to call it, and then apparently intermittently performed CPR while attempting to start an IV.

The EMT tried twice to start an IV, was unsuccessful, and the paramedic intubated the patient. There's some debate on whether or not that was successful, but anyway, was managing the airway. They were intermittently doing compressions during this.

They hooked him up to a monitor which supposedly showed asystole on two different leads, but we have no strip that I'm aware of that would substantiate one way or the other that, and then they transported him to the hospital.

And apparently in the interim there are a couple of notes that upon arrival at the scene when the ambulance got to the house, Mr. Wilson was still pink and warm. And then when he got to the emergency department, the notes there clearly indicate he was deeply cyanotic, blue, so there had been a significant change, deterioration in his coloring during that period of time.

They briefly worked on him in the emergency department, but it was felt due to the length of him being down and the condition upon which he presented, being deeply cyanotic, et cetera, that he was probably not resuscitatible and they I think quit after approximately eleven minutes.

They had given a couple of rounds of medications but felt like it was pretty futile at that time. The monitor at that time did show that he was in asystole.

The first rhythm strip that I saw looks like he might have had actually what we call an anneal ventricular rhythm with very slow sporadic spontaneous heartbeats, but were not perfusing, not doing anything to maintain life.

Q. Dr. Smith, based upon your education, training and experience as an emergency room physician, based upon your review of the records and the fact that you just stated, do you have an opinion based upon a reasonable degree of medical certainty as to what happened to Clay Wilson that evening?

A. Well when I was first – let me make that addition. I want to add something to the clinical scene and this hit me last night while I was reviewing documents.

In both Mr. Cline's deposition and in Ms. Wilson's deposition, they both clearly state that Mr. Wilson's pupils were constricted. And to me that's very significant and I can't believe I hadn't picked up on this earlier, but it just hit

me like a bolt of lightening last night.

Pupils are very sensitive to oxygen supplied to the brain, and when you cut that oxygen supply off, in approximately 45 seconds the pupils will dilate, you'll have the classic fixed dilated pupils, and nowhere is that mentioned.

In fact, specifically the opposite is mentioned from the standpoint of what his pupil condition was at the house. And to me that is very consistent with the EMT saying that he was pink and warm at the scene, because to me his brain was being perfused at the time they got to the house because that's the only was these pupils stay constricted.

And I almost forgot it again, but that's something I wanted to make sure I put in there, because that to me is crucial here from the standpoint of survivability of the brain. So now that said, I forgot your question, I'm sorry.

Q.      What do you think happened to Clay Wilson that night?

A.      Well when I first read the chart, really two things went through my mind. The first one which I really rather rapidly dismissed was the thought that he might have had an acute bleed into his brain. Certainly that can happen.

We have these little weaknesses in our blood vessels called aneurysm. And there are about 20 people in here, so approximately four people in here have them already. About 20 percent of the population have them; fortunately they don't all burst.

But in my experience, several things don't fit with that having happened. One, I've never had a patient or their family relay to me that somebody had this feeling – and I'll bet he was having a feeling of impending doom although that was never said – but I've never had anybody present with a history of just where they didn't feel good, got up, walked around a little bit, felt better, laid back down and didn't feel food, got up walked and then had a seizure and went out. Just never had that history in 30 years of practice.

And I've had folks who – we are always told if somebody presents with a seizure and unconscious, you worry about a stroke, and I've evaluated probably a couple of thousand people in that scenario, and rarely do we even find a stroke in that setting. So that, number one, it just didn't fit the scenario.

And two, this thing with the pupils and usually you'll get one pupil dilated if you have a massive stroke. One at least, sometimes two, but usually at

-6-

least one because most of the pressure will be on one side of the brain and it will effect the third optic nerve and dilate it. So that just didn't fit to me.

So then I went to the other most likely cause of sudden death in a relatively young man, and 51 is younger all the time, and that's, of course, acute cardiac collapse, and I would say that this scenario is much more compatible with that.

Just because – lots of patients both have told me themselves and families have related later that, you know, well they weren't feeling good, they got up, they walked around, they felt better, came back, laid back down, may have done that once, maybe done it three or four times during the course of a short period of time and then they went out type thing. And so that's much more compatible with my experience as far as how patients frequently present.

So looking at all of that, I came to the conclusion that I thought it was much more likely that this was a cardiac event as opposed to a neurologic event.

Q.    Is that what laymen would just call a heart attack?

A..   Well some folks will call it a stroke and mean either one of those so sometimes that gets kind of gray, but yes.

My conclusion was it was cardiac and in the lay population that would primarily mean they had a heart attack.

Q.    What is the most common thing that happens in that scenario to the heart? What happens?

A.    Well when you acutely block or either totally or partially block the blood supply to a part of the heart, that muscle becomes very irritated, and the heart muscle has its own built-in pacing machine, if you will, so it wants to beat rhythmically on its own. And the famous frog experiment when you cut the heart out and lay it on a table and it continues to beat for a long period of time, well that's what heart muscle in the human is like, it's made to beat. And when you take away some of that blood supply, that muscle becomes irritated and sometimes it causes pain, we call angina; sometimes it doesn't cause anything that the patient can really specifically feel necessarily. But then it reaches a certain point where instead of beating in a rythmatic fashion, it just sort of starts to quiver and we call that fibrillation.

You can have atrial-fibrillation which is usually not fatal, you reduce the amount of blood your heart pumps by about 15 percent. In some people

that's crucial, but most of the time atrial-fibrillation is not fatal.

But if you take that down to the ventricles, the larger ventricles, that pumps most of the blood in the human heart, if they start to quiver and are not effectively circulating blood, then you die if that's left untreated. That may very well have been what happened to him.

The only thing that makes me wonder if he didn't completely fibrillate but maybe had an episode where he had became extremely slow in his heartbeat, and we call the (sic) bradycardia, is that he continued to be pink and warm and supposedly to breathe.

Well, if you're pure fibrillation, you're not going to continue to breathe unless the CPR is superb, and that is possible. I have had actually had several patients who we had them on a heart monitor, they were fibrillating, but while we were doing their CPR, they were awake and talking to us. And then we would stop to defibrillate them and they would go unconscious again, and then we'd start back up and they would wake right back up again. And that's a really unpleasant feeling especially when you can't get them out of that.

So it's possible that he could have been fibrillating and with excellent CPR remained pink, continued to breathe, et cetera, and we'll never know.

Dr. Smith further testified, without objection, the "only thing *they* [the paramedic and technician] absolutely had to take in [the house] was the monitor defibrillator. . . . And for *them* to go in there with an airway kit is just ridiculous." [Emphasis added]. Further,

"the fact that he never even got put on a monitor until they actually got him back out to the truck which is somewhere around 10 to 12 minutes after they arrived . . . didn't get the potentially definitive care."

When asked if the paramedic and technician had used a defibrillator on Mr. Wilson what his chances were of surviving, Dr. Smith replied "I'd say 60 to 70 percent," and "that he would have been close to if not totally normal neurologically."

On cross-examination, Dr. Smith testified that Mr. Wilson had some degree of underlying coronary heat disease; that 50 percent of first heart attacks are fatal; that "we know absolutely nothing about his heart attack"; that it is impossible to determine Mr. Wilson's life expectancy; "that without an autopsy there is no way to really know for sure what happened to him." On redirect, he reiterated his opinion that Mr. Wilson suffered a cardiac event.

Dr. Brian McMurray, also board-certified in emergency medicine, testified that the most likely explanation for the death of Mr. Wilson was ventricular fibrillation, and that even had he been defibrillated his chance of survival was nonexistent.

Dr. Francis Fesmire, also board-certified, testified that in his opinion Mr. Wilson suffered a subarachnoid hemorrhage which the paramedic could not have treated.

The defendants argue that the testimony of Dr. Smith, and the conclusions derived from it, is speculative and thus unfair, because the burden is always on the plaintiff to prove her case by a preponderance of all the evidence. But a contrary conclusion would yield the same argument, from a different perspective, thus giving rise to the salutary concept that appellate courts do not exercise original jurisdiction but must defer to findings of trial judges that are supported by preponderant evidence. We are frank to say that the evidence on the issue of causation, or loss of chance of survival, is troublesomely close, but we cannot find that the evidence preponderates against the finding of the trial judge.

## Issues Two and Three

The plaintiffs were awarded $385,000 for the "pecuniary value" of the decedent's life.[2] Defendants argue that this award is excessive, since the decedent, a farmer, suffered a loss of income for eight of the last nine years of his life. Moreover, the defendants argue that had Mr. Wilson survived, his life expectancy is unknown, and his ability to work is likewise unknown. Thus, the defendants argue, the pecuniary value is limited to funeral expenses. The trial judge approved the testimony of Dr. John Moore, an economist, that the value of Mr. Wilson's *earning capacity* was $375,926. *See, Spencer v. A-1 Crane Services Inc.*, 880 S.W.2d 938 (Tenn. 1994). The evidence does not preponderate against the award of damages for the economic loss incurred by the plaintiffs.

The trial court then made a separate award of $500,000 for "consortium-type" damages, citing *Jordon v. Baptist Three Rivers Hospital*, 984 S.W.2d 593 (Tenn. 1999). As explained below, we do not believe the trial judge intended to award a double recovery, since loss of consortium is a *factor* to be considered in a determination of the *pecuniary* value of a life. In his determination of the "pecuniary value" of the decedent's life the trial court *prima facie* did not consider the factor of loss of consortium, but, as stated, considered the issue separately.

---

[2] We think the trial judge inadvertently used the term "pecuniary value" when "economic loss" was intended, because the award of $385,000 is derived from the opinion of the economist, Dr. John Moore, that the value of the decedent's earning capacity was $375,000 to which was added funeral expenses. If the court intended the award to compensate the plaintiffs for the *pecuniary value* of their decedent's life, as distinguished from *economic loss*, the additional award of $500,000 for "consortium type damages" would amount to a double recovery, since damages for loss of consortium are encompassed in an award for pecuniary damages. *Hill v. City of Germantown*, 31 S.W.3d 234 (Tenn. 2000) ("[L]oss of consortium damages in a wrongful death claim are wholly contained within the award for wrongful death."); *Jordan v. Baptist Three Rivers Hospital*, 984 S.W.2d 593 (Tenn. 1999) ("[L]oss of consortium damages are recoverable by a decedent's family as part of the pecuniary value of a decedent's life").

The award of a recovery for wrongful death is based on many factors, including age, health and strength, capacity for work, personal habits, loss of consortium, and the like. The decedent was described as well-educated, happy, jolly, a conservationist, sober and industrious. The dark side was the state of his health immediately before his heart attack, and what would have been the state of his health had he survived, assuming proper care and treatment. To avoid the obvious specter of speculation, since a monetary value cannot be placed with exactness on any of the factors to be considered, it has consistently been held in Tennessee that the amount of a recovery is to a large extent discretionary with the trial judge. *See, Spencer v. A-1 Crane Service's Inc.*, 880 S.W.2d 938 (Tenn. 1994).

The trial judge did not articulate his reason(s) for the amount of the award for loss of consortium. We think it evident that when considered as a *factor* in a determination of the pecuniary value of the decedent's life, the award is excessive.

The decedent obviously suffered a disabling attack. Had he survived, the extent of his disability cannot be known. His life expectancy is unknown; his capacity for life is unknown; the quality of his life is unknown; whether he would have continued to be companionable or fatherly is unknown; whether he could have provided spousal or paternal attention, guidance or care, protection, training, affection or love is unknown. The defendants correctly argue that the burden of proving loss of consortium is upon the plaintiffs, and this case is perilously close to a complete absence of proof other than that afforded by a presumption of continued consortium had the decedent survived. The testimony of Dr. Smith offers some support for loss of consortium damages ["60 percent chance of survival with minimal neurological damage"] while conceding a lack of reasonable definitiveness. We think, and so hold, that a recovery of $500,000 as damages for the wrongful death of Mr. Wilson is justified by the evidence.

### Issue Four

T.C.A. § 29-20-310(b) removes the immunity of a governmental employer who is a health care practitioner, as is the defendant Cline. The defendants argue that this statute violates the equal protection provisions of the Tennessee and United States Constitutions. This argument has been resolved by the Western Section of this court in *Todd and State of Tennessee v. Weakley County d/b/a/Weakley County Nursing Home, et al*, No. 02A01-9708-CV-00197 (Tenn. App. July 16, 1998), which held that the statute was constitutional. The defendants raise an issue not involved in *Todd*, which questions the constitutionality of T.C.A. § 29-20-310 because a health practitioner employed by the State is immune from personal liability under T.C.A. § 9-8-307. The defendants argue that since the health practitioner is employed by the County - rather than by the State - he enjoys no immunity and thus is denied equal protection. This argument overlooks the fact that Mr. Cline is treated no differently than other paramedics similarly situated.

## Issue Five

This issue poses the question of whether the provisions of T.C.A. 29-20-311 were violated by the entry of a judgment exceeding the "minimum amount of insurance coverage for death" specified in T.C.A. § 29-20-403.

T.C.A. § 29-20-404(a) provides that

A governmental entity or the insurer of such governmental entity shall not be held liable for any claim arising under state law, for which the governmental entity has immunity under the provisions of this Chapter unless the governmental entity has waived its immunity.

T.C.A. § 29-20-403(b)(2)(A) provides for minimum limits of not less than $130,000.00 for . . . death of any one person, unless the governmental entity has waived its immunity. Dickson County has not waived its immunity by the purchase of a policy of insurance because the policy did not expressly so provide, T.C.A. § 29-20-404. *See, **Colburn v. City of Dyersburg***, 774 S.W.2d 610 (Tenn. Ct. App. 1989), and hence is liable only to the extent of $130,000. The total judgment, as to the defendant Cline, is reduced to $500,000.

## Issue Six

Defendants question the award of $18,662.96 for discretionary costs. Rule 54.04 T.R.C.P. controls. It provides, as relevant here, that discretionary costs allowable are: (1) reasonable and necessary court reporter expenses for depositions and trials; (2) reasonable and necessary expert witness fees for depositions and trial. The fees of Rieback Consultants, $3802.50, are not allowable; the fee of Dr. Earl Smith, "for post-depo time spent," $1,690, is not allowable; the travel expenses of Dr. Smith and Dr. Moore, $2,259.08, are not allowable. An award of $4,000 for the court appearance of Dr. Smith of less than two hours is excessive by $2,000 and is therefore partially disallowed. The judgment awarding discretionary costs is accordingly modified.

The judgment is affirmed in part and modified in part. The case is remanded for all appropriate purposes. One-half of the costs are assessed to the plaintiffs; one-half of the costs are assessed to the defendants, all jointly and severally.

_____
WILLIAM H. INMAN, SENIOR JUDGE